**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ANGELA WILSON,

      Plaintiff,

      vs.                            CIV No. 22-0223 KK

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

      Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER is before the Court upon Plaintiff's Opposed Motion to Reverse or Remand (Doc. 26), dated November 14, 2022, challenging the determination of the Acting Commissioner of the Social Security Administration ("the Commissioner") that Plaintiff is not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34 or to supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f before September 1, 2016. On February 10, 2023, the Commissioner filed a response, and on February 24, 2023, Plaintiff filed a reply. (Docs. 32; 33.) The Court has thoroughly reviewed the administrative record, the parties' briefs, and the relevant law, and for the reasons set forth below, finds that Plaintiff's motion is not well-taken and will be DENIED.

## I.  BACKGROUND AND PROCEDURAL POSTURE

In January 2012, Plaintiff filed applications for disability insurance benefits ("DIB") and social security disability income ("SSI"). (*See* Administrative Record ("AR") 2327-46.) Plaintiff alleged that she had become disabled on December 15, 2005, due to knee and ankle injuries, foot weakness, and diabetes. (AR 565, 571, 2327, 2340.) Plaintiff's date last insured, for purposes of her DIB claim, is June 30, 2010. (AR 571.)

Plaintiff's application was denied at the initial level on March 26, 2012 (AR 565-75), and at the reconsideration level on March 30, 2012 (AR 578-97). Following a hearing, Administrative Law Judge ("ALJ") Valencia Jarvis issued a decision on October 10, 2013, in which she determined that Plaintiff was not disabled at any time between the alleged disability onset date and the date of her decision. (AR 603-10.) On February 4, 2015, the Appeals Council vacated ALJ Jarvis's decision and remanded the claim for another administrative hearing under the substantial evidence provisions, 20 C.F.R. § 404.970 and § 416.1470. (AR 616-19.) According to the Appeals Council, ALJ Jarvis's October 10, 2013 decision improperly weighed the findings of a single decisionmaker, did not adequately address opinion evidence from a treating physician, and improperly characterized Plaintiff's past relevant work. (AR 617-18.)

Plaintiff appeared before ALJ Jarvis for a second administrative hearing on January 19, 2017. (AR 625-35.) Following that hearing, ALJ Jarvis issued a partially-favorable decision on May 24, 2017, finding Plaintiff disabled as of September 12, 2011, a date after the expiration of her insured status for DIB.[1] (AR 625-35.)

Plaintiff requested review of ALJ Jarvis's partially-favorable decision before the Appeals Council, which the Council granted on January 9, 2018. (AR 643-45.) Vacating ALJ Jarvis's decision for a second time, the Appeals Council remanded for another hearing before a *different* ALJ. (AR 643-45.) According to the Appeals Council, ALJ Jarvis improperly relied upon Medical Vocational ("Grid") Rule 201.14 to find Plaintiff disabled upon turning 50 years old. (AR 644.) The Appeals Council explained that Grid Rule 201.14 only applied to claimants with an RFC for sedentary work, not for those, like Plaintiff, who had an RFC for light work. (AR 644.) The

---

[1] To qualify for DIB, a claimant must establish that she met the statutory requirements for disability on or before her date last insured. *See Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010). Here, Plaintiff's date last insured was June 30, 2010. (AR 571.)

Appeals Council further concluded that ALJ Jarvis had improperly relied upon the vocational expert's testimony that Plaintiff could perform skilled jobs absent testimony that she had acquired the necessary transferable skills from past relevant work. (AR 644.) On remand, the Appeals Council instructed the new ALJ to, among other things, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base and to determine whether she had acquired relevant transferable skills. (AR 644.)

Following a third administrative hearing, ALJ Ben Ballengee issued his own partially-favorable opinion on August 16, 2018, finding Plaintiff disabled beginning September 1, 2016. (AR 2078-89). Plaintiff requested review of ALJ Ballengee's decision before the Appeals Council, which the Council denied on April 11, 2019. (AR 2098-2100.)

In April of 2019, Plaintiff appealed the Commissioner's decision to this Court. *See generally Wilson v. Soc. Sec. Admin.*, 19cv380 CG (D.N.M.) A few months later, in June 2019, Plaintiff submitted additional evidence to the Appeals Council, which issued an order vacating its April 2019 denial of her request for review. (AR 2112.)  Because the Appeals Council subsequently determined that it lacked jurisdiction due to the pending appeal in federal court, however, it subsequently vacated its June 2019 order. (AR 2112.) On October 1, 2019, the Commissioner filed an unopposed motion to remand to the Social Security Administration ("SSA") pursuant to sentence four of 42 U.S.C. § 405(g), which the Honorable Carmen Garza of this District granted the same day. (*See* AR 2114.) *See also Wilson*, 19cv380 CG (Docs. 19; 21) (D.N.M. Oct. 17, 2019).

In a December 23, 2019 order remanding, the Appeals Council affirmed ALJ Ballengee's determination that Plaintiff was disabled beginning September 1, 2016, but vacated his decision with respect to the issue of disability before that date. (AR 2118-20.) The Appeals Council

explained that it had received nearly 400 pages of additional medical records from 2017 to 2019, including mental health records, that warranted consideration. (AR 2118-20.) The Appeals Council instructed the ALJ on remand to obtain additional evidence to complete the administrative record in accordance with regulatory standards, to further evaluate Plaintiff's mental impairments, and to give further consideration to Plaintiff's RFC, providing specific references to evidence in support. (AR 2119.) The Appeals Council also instructed the ALJ to obtain evidence from a vocational expert, if necessary, to clarify the effect of the assessed limitations on Plaintiff's occupational base. (AR 2119.)

On remand, ALJ Stephen Gontis held a fourth administrative hearing on May 8, 2020, and on June 19, 2020, he issued a decision finding Plaintiff not disabled for the period before September 1, 2016. (AR 2002-2014.) Pursuant to 20 C.F.R. § 404.984, ALJ Gontis's decision became the final decision of the Commissioner, and Plaintiff again appealed to this Court on October 16, 2020. *Wilson v. Soc. Sec. Admin.*, 20cv1066 CG (Doc. 1) (D.N.M. Oct. 16. 2020) ("*Wilson II*"). On September 24, 2021, Judge Garza granted Plaintiff's motion to reverse and remand on the basis that ALJ Gontis had not adequately considered Plaintiff's sleep apnea impairment. (AR 4256-82.) *See also Wilson II*, (Doc. 31) (D.N.M. Sept. 24, 2021). On October 8, 2021, the Appeals Council remanded for further proceedings and instructed the ALJ to consider only the period before September 1, 2016. (AR 4283-85.)

ALJ Jennifer M. Fellabaum conducted a fifth administrative hearing on December 10, 2021. (AR 4164-4225.) Plaintiff was represented by counsel and testified at the hearing, as did vocational expert Eligio Hinojosa and medical expert Steven Baum, Ph.D. (AR 4164-4225). On January 27, 2022, ALJ Fellabaum issued her decision, finding that Plaintiff was not disabled from the alleged onset date of December 15, 2005, through August 31, 2016, under the relevant sections

of the Social Security Act. (AR 4134-50.) Because the Appeals Council did not assume jurisdiction, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 404.984(a). On March 28, 2022, Plaintiff filed her Complaint in this case seeking review of the Commissioner's decision. (Doc. 1.)

## II. LEGAL STANDARDS

### A. Standard of Review

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation omitted). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (citation omitted). The Court's examination of the record as a whole must include "anything that

may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citation omitted).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks, brackets, and citation omitted omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) (citations omitted). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### B.  Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920(a)(4). If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *See Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of her impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner

must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient [RFC] to perform work in the national economy, given [her] age, education and work experience." *Grogan*, 399 F.3d at 1261 (citation omitted); *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## III.  THE ALJ'S DETERMINATION

ALJ Fellabaum reviewed Plaintiff's DIB and SSI claims pursuant to the five-step sequential evaluation process. (AR 4134-50.) First, she found that Plaintiff met the SSA's insured status requirements through June 30, 2010, and had not engaged in substantial gainful activity since her alleged onset date of December 15, 2005, through August 31, 2016. (AR 4137.) The ALJ found at step two that, during the relevant time period, Plaintiff suffered from the severe impairments of "degenerative joint disease of the knees; right knee meniscal tear, status-post arthroscopic repair; left ankle osteoarthritis; obesity; depressive disorder; anxiety disorder; [and] emotional and social impairment." (AR 4137.) Additionally, the ALJ determined that Plaintiff suffered from numerous nonsevere impairments, including obstructive sleep apnea, hypertension, gastroesophageal reflux disease, diabetes mellitus, overactive bladder, uterine fibroids, plantar fasciitis, migraine headaches, degenerative changes of the cervical spine with prior fusion, and degenerate changes of the lumbar spine, right shoulder, and right hand. (AR 4137-38.) The ALJ acknowledged that "variant mental diagnoses appeared in the record," including an eating disorder,

dyslexia, communication disorder, obsessive-compulsive disorder, and mood disorder. (AR 4137.) Although the ALJ indicated that she considered all of Plaintiff's "mental complaints," she explained that the mental impairments of depressive disorder, anxiety disorder, and emotional and social impairment "best represent[ed] the symptoms and signs during the relevant time." (AR 4137.)

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of listed impairments under Appendix 1 of the SSA's regulations during the relevant time period of December 15, 2015, through August 31, 2016. (AR 4138.) As such, the ALJ went on to review the evidence of record, including medical opinions and evidence from treating and consulting providers, prior administrative medical findings, and Plaintiff's own subjective symptom evidence. (*See* AR 4140-48.) Having done so, the ALJ concluded that for the relevant period, Plaintiff possessed an RFC to

> lift, carry, and push and pull up to 20 pounds occasionally, up to 10 pounds frequently, sit normally in an 8-hour day, and stand or walk for 4 hours in an 8-hour day[,] . . . occasionally climb ramps and stairs, balance, crouch, kneel, and crawl[;] . . . never climb ladders, ropes, or scaffolds, or be exposed to unprotected heights, hazardous machinery, or concentrated exposure to extreme cold, wetness, or humidity[;] . . . occasionally use right foot controls and rarely use left foot controls, which is defined as less than 10% of the workday[, but] . . . not operate a motor vehicle for commercial purposes[;] . . . perform simple, routine tasks, with no fast-paced production work[;] . . . make simple work decisions[;] . . . perform[ work] in the same location every day with no more than occasional changes to the work assigned[; and] . . . occasionally interact with co-workers, supervisors, and the general public, with no team or tandem tasks.

(AR 4140.) Based on this RFC, ALJ Fellabaum found that Plaintiff was unable to perform any past relevant work during the relevant period. (AR 4148.)

However, at step five, the ALJ determined that "there were jobs that existed in significant numbers in the national economy that [Plaintiff could] perform . . . ." (AR 4148). The ALJ

therefore concluded that "[d]uring the period at issue, from December 15, 2005, through August 31, 2016, [Plaintiff] was not under a disability, as defined in the Social Security Act. (AR 4149.)

## IV. DISCUSSION

This case has a long procedural history, with five administrative hearings, numerous remand orders issued by the Appeals Council, and three federal court appeals. The issue before the Court, however, is relatively narrow: whether ALJ Fellenbaum committed reversible error in concluding that Plaintiff was not disabled between December 15, 2005, her alleged disability onset date, and September 1, 2016, the date on which the Commissioner previously determined that she was disabled. Plaintiff contends that ALJ Fellenbaum committed three errors that warrant an immediate award of benefits: (1) she failed to properly consider the opinions of a consultative examiner, Dr. Steven Baum (Doc. 26 at 29-31); (2) she failed to properly consider the opinions of her treating mental health providers, Drs. James Gillies and Corey Barger (*id.* at 31-33); and (3) she failed to meaningfully consider Plaintiff's hearing testimony (*id*. at 33-36).

The Commissioner, on the other hand, insists that the ALJ gave valid reasons for the weight she gave to the medical opinions at issue and to Plaintiff's hearing testimony and, further, that substantial record evidence supports her conclusion that Plaintiff could perform unskilled jobs existing in significant numbers in the national economy. (Doc. 32 at 1.) As explained hereinafter, the Court agrees with the Commissioner and will therefore affirm.

### A.  The ALJ properly considered the opinions of Dr. Steven Baum.

At the request of Plaintiff's counsel, Steven Baum, Ph.D. evaluated Plaintiff and provided a report in early December 2021, outside the relevant time period in this case. (AR 4465-73.) During the course of his multi-day evaluation, Dr. Baum interviewed Plaintiff and her daughter and performed various psychometric tests, including the St. Louis Mental Status Examination, the

Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), and the Functional Assessment Screening Test. (AR 4467.) He reported that Plaintiff was "unfocused" in reporting her history, required repeated redirection, and necessitated a second session "though to little avail." (AR 4465.) Although Plaintiff's responses were "less than orderly," Dr. Baum found Plaintiff oriented x 3, behaviorally appropriate with clinical interviews, and with fair judgment. (AR 4465.) At the same time, he observed that she was anxious and had flat affect. (AR 4465.) Following this evaluation, Dr. Baum diagnosed Plaintiff with the following: "Eating Disorder (by hx)[,] Skin Excoriation (unreported undisclosed)[,] . . . Dyslexia (reading)[,] Communication Disorder[,] . . . Depression/Mood Disorder likely Bipolar II Disorder[,] Obsessive Compulsive Disorder[, and] Emotionally Impaired (likely diagnosis from childhood)." (AR 4469.) He indicated that Plaintiff's prognosis was "poor," explaining that "she would be unable to meet the more stressful demands of an average workplace environment." (AR 4469.)

In terms of functional abilities, Dr. Baum opined that Plaintiff had severe limitations in understanding and remembering detailed or complex instructions, in carrying out instructions, in attending and concentrating, and in working without supervision. (AR 4470.) He found moderate to severe limitations in interacting with the public, coworkers, and supervisors and in adapting to workplace changes. (AR 4470.) Finally, he opined mild to moderate limitations in understanding and remembering very short and simple instructions. (AR 4470.) Dr. Baum also found "marked deficits in [Plaintiff's] concentration, social skills, and communication," such that she "would not be capable of being tolerated in the average work setting." (AR 4469.) He described Plaintiff's limitations in maintaining attention, memory, and concentration as "lifelong problems." (AR 4465.)

At the request of Plaintiff's counsel, Dr. Baum testified as an expert witness at the December 2021 administrative hearing before ALJ Fellabaum. (*See* AR 4179-4202.) There, Dr. Baum reported seeing Plaintiff seven times between October and December 2021. (AR 4180.) He testified that multiple appointments were necessary, because Plaintiff "tends to be a little bit vague and has a memory problem that sometimes needs prompting, or she has to think about it and get back to me." (AR 4180.) Dr. Baum explained that in addition to conducting various evaluations and tests, he reviewed Plaintiff's medical records, including hospitalization notes and "anything that said psych or hand [sic] any inclination of clinical relevance to the case." (AR 4180-82.) He indicated that he "involved" Plaintiff's daughter as a "collateral interviewee," because Plaintiff "is forgetful, or tells . . . little bits and pieces of what's going on with her." (AR 4180-81.)

As the Commissioner points out in his response brief, Dr. Baum's report did not explicitly relate the opinions in his 2021 report to the relevant period. (Doc. 32 at 8.) He did, however, describe Plaintiff's limitations in maintaining attention, memory, and concentration as "lifelong problems" and indicated that her emotional impairment diagnosis was "likely [a] diagnosis from childhood." (AR 4465, 4469.) When asked whether his 2021 evaluation was relevant to Plaintiff's condition before June 30, 2010, Dr. Baum testified as follows:

> [T]he short answer is yes, because this is a – there was no single event or incident that would have created the problems that – and the clinical diagnoses that were given. This is primarily a lifelong disorder. . . . [T]here is a course of events that haven't been changed since that time. In a reasonable world, she would have been diagnosed early and targeted out for special education and cognitive enhancements wherever they could be in social development which was stagnant. But instead, she kind of got through the system and passed over . . . with the people that would accommodate her in different ways.

(AR 4181-82.) Dr. Baum later clarified that the "lifelong disorder" to which he referred was Plaintiff's "[e]motional impairment," sometimes referred to as "cognitive and social development

pathology." (AR 4183.) Because of her emotional impairment, he hypothesized that "in a work setting [Plaintiff would] probably alienate people that didn't get her, and other people would find her kind of playful . . . , but she would have difficulty without accommodation." (AR 4185.)

Because Plaintiff's claims were filed before March 27, 2017, the ALJ was required to evaluate Dr. Baum's opinions under 20 C.F.R. § 404.1527 and § 416.927.[2] Accordingly, she considered the factors set out in 20 C.F.R. § 404.1527(c) and § 416.927(c), which included:

> (1) The length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

See Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003) (quotation omitted).

The ALJ was required to discuss not only "the evidence supporting [her] decision" but also "the uncontroverted evidence [s]he [chose not to rely upon, as well as significantly probative evidence [s]he reject[ed]." Clifton, 79 F.3d at 1009-10 (citations omitted). "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence." Carpenter v. Astrue, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted). Moreover, the ALJ could not "mischaracterize or downplay evidence to support her findings." Bryant v. Comm'r, SSA, 753 F. App'x 637, 641 (10th Cir. 2018) (citing Talbot v. Heckler, 814 F.2d 1456, 1463-64 (10th Cir. 1987). In short, the ALJ was tasked with

---

[2] The new regulations concerning the handling of medical opinion evidence as of March 27, 2017, which are found at 20 C.F.R. § 404.1520c and § 404.920c, do not apply to this proceeding.

providing "appropriate explanations for accepting or rejecting" the medical opinions at issue. *See* Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *5 (July 2, 1996).[3]

The ALJ summarized Dr. Baum's hearing testimony and recounted the opinions contained in his 2021 report. (*See* AR 4146.) For example, she noted the impressions that Dr. Baum related at the administrative hearing: that Plaintiff was "fragile," became overwhelmed with assigned tasks, had "impoverished social reactions," could not distinguish friend or foe, would be "devastated" and/or "paranoid" in the face of criticism, and had little capacity to adapt to changes. (AR 4146.) The ALJ also highlighted Dr. Baum's opinions that Plaintiff's mental limitations were largely in the "moderate to severe" range[4] and that she had "marked deficits in concentration, social skills, and communication" that would render her incapable of maintaining work in the average work setting. (AR 4146 (citing AR 4469-70).)

The ALJ accorded "great weight" to Dr. Baum's diagnosis of an emotional and social impairment, because she found that he "thoroughly explained the basis for this diagnosis." (AR 4146.) In contrast, she gave only "partial weight" to Dr. Baum's opinions related to "the severity and functional impact" of that impairment, because she determined that these opinions were inconsistent with the totality of evidence during the relevant period. (AR 4146-47). Helpfully, the ALJ specified the evidence that she considered inconsistent with Dr. Baum's opinions as to the severity and functional impact of her mental impairments. (*See* AR 4147.)

---

[3] Although SSR 96-5p has been rescinded for claims filed on or after March 27, 2017, *see* SSR 96-2p, 2017 WL 3928298, at *1 (Mar. 27, 2017), that guidance remains entitled to deference here because Plaintiff's claims were filed before that date.

[4] Dr. Baum found moderate to severe limitations in Plaintiff's ability to interact with the public, coworkers, and supervisors as well as her ability to adapt to changes in the workplace. (AR 4470.) He found severe limitations in Plaintiff's ability to understand and remember detailed or complex instructions, to carry out instructions, to attend and concentrate, and to work without supervision. (AR 4470).

First, she found Dr. Baum's opinion that Plaintiff's mental symptoms had been disabling on a "longstanding and lifelong basis" to be inconsistent with Plaintiff's education and employment history. (AR 4147.) The ALJ observed that Plaintiff "had periods of time as an adult where was able to sustain skilled employment and advanced education, suggesting that she had periods of stability where she could perform work functions." (AR 4147.) The ALJ noted that Plaintiff obtained her Master's degree and performed skilled employment as a teacher for a number of years. (AR 4147 (citing AR 898-904, 4164-4225).) She cited Plaintiff's work history, which revealed that Plaintiff worked as a substitute teacher from January 1992 to May 1994, an elementary teacher from January 1997 to July 2001, an assistant social worker from September 2001 to August 2002, and a housekeeping supervisor from October 2004 to December 2005. (AR 4147 (citing AR 898-904).) The ALJ also referred to Plaintiff's hearing testimony during which she testified that she taught second grade for approximately three and a half years, albeit at three different schools, before working as an assistant social worker and later a supervising housekeeper. (AR 4203-07.) In contrast to her teaching job, which she described as "very, very difficult and very stressful," Plaintiff described her supervising housecleaning position as relatively easy for her to manage. (AR 4205-07.) She explained, however, that she was injured while working as a housecleaner and ultimately fired for not clocking out when she attended physical therapy. (AR 4205-07). To the extent Dr. Baum determined that Plaintiff's mental impairment precluded work on a "longstanding and lifelong basis," Plaintiff's work history and hearing testimony, both referenced by the ALJ, constitute substantial evidence to the contrary.

Second, the ALJ found Dr. Baum's opined moderate to severe functional mental limitations inconsistent with "the totality of evidence or lack thereof during the relevant time." (AR 4147.) The ALJ reasoned that "other evidence during the relevant time suggest[ed] that [Plaintiff]

remained capable of simple, routine tasks." (AR 4147 (citing AR 4102-04).) By way of example, she pointed to a psychological report prepared by consultative examiner Majid A. Shams following his examination of Plaintiff in May 2006. (AR 4147 (citing AR 4102-04).) The Court takes up the ALJ's treatment of Dr. Shams's report in more detail when addressing the third *Watkins* factor below. However, for purposes of the present analysis, the Court observes that the ALJ found that Dr. Shams's mental status examination and observations supported a finding that Plaintiff was capable of unskilled work. (AR 4146-47.) As discussed below, the Court can follow the ALJ's analysis, and her conclusion that Dr. Shams's period-relevant mental status examination evidence contradicted Dr. Baum's 2021 opinions constitutes a valid reason for rejecting the latter. (*See* AR 4147.)

Relatedly, in rejecting Dr. Baum's moderate to severe mental limitations, the ALJ also determined that "examinations performed during the relevant period did not demonstrate any marked or extreme limitations." (AR 4147 (citing AR 2425-27).) The ALJ cited two reports, both from 2006, in support of this finding: the aforementioned psychological report prepared by Dr. Shams and a Psychiatric Review Technique ("PRT") form completed by consultative examiner Carol Deatrick, Ph.D. in Jun 2006 following her review of the record. (AR 4147 (citing AR 2425-27).) Although the ALJ did not directly discuss the contents of either Dr. Shams's report or Dr. Deatrick's report in the context of her rejection of Dr. Baum's opined mental limitation, she did so elsewhere in her decision. Most obviously, in her discussion of Dr. Shams's evaluation, she observed that Dr. Shams "did not opine specific functional limitations." (AR 4146.) She likewise explained that "any implication [by Dr. Shams] of greater limits" than those determined in the ALJ's RFC was "not consistent with Dr. Shams's contemporaneous mental status exam and observation." (AR 4146.) Once again, consideration of Dr. Shams's report and examination

findings is taken up below, but for present purposes the Court is satisfied that it can follow the ALJ's reasoning that Dr. Shams's mental examination findings did not demonstrate marked or extreme limitations.

With respect to Dr. Deatrick's PRT, the ALJ observed that she "opined that [Plaintiff's] mood disorder caused no more than mild restriction in maintaining concentration, persistence, or pace and that she otherwise had no mental restriction." (AR 4145 (citing AR 4109-22).) Although the ALJ accorded "little weight" to these opinions by Dr. Deatrick, she did so because she found the relevant evidence supported a *more restrictive* mental RFC.[5] She found Dr. Deatrick's opinions inconsistent with Shams's examination findings that Plaintiff "demonstrated impaired attention and concentration" and inconsistent with other examinations and reports from Plaintiff. (AR 4145 (citing AR 4102-04).) Dr. Deatrick opined that Plaintiff's mental impairment was "Not Severe," but the ALJ disagreed, concluding that the evidence of record supported a "severe mental impairment[] warranting limitations." (AR 4145.) Still, the PRT, which was a product of Dr. Deatrick's review and consideration of medical evidence available as of June 2006, provides additional support for the notion that Plaintiff's period-relevant examinations did not reveal marked or extreme limitations. Ultimately, the Court is satisfied that Dr. Deatrick's PRT and Dr. Shams's examination findings, taken together, provide substantial evidence for the ALJ's determination that "examinations[6] performed during the relevant period did not demonstrate any marked or extreme limitations." (AR 4109.)

---

[5] The Court's review of Dr. Deatrick's June 1, 2006 PRT reveals that Dr. Deatrick, in her rating of functional limitations under the "B" criteria of the Listings, opined that Plaintiff had no limitations in maintaining social functioning and only "mild" limitations in maintaining concentration, persistence, or pace. (AR 4119.) Dr. Deatrick further observed in the "Consultant's Notes" portion of the PRT that while Plaintiff's "mental eval. found some reduction of [concentration, persistence, or pace] secondary to phys. px.," her mental status examination was "essentially intact, as [was] behavior." (AR 4122.)

[6] The Court acknowledges the ALJ's use of the plural "examination*s*." Technically, the ALJ cited only Dr. Shams's examination and Dr. Deatrick's PRT, which amount to *one examination* and one report opining mental functional

Third, the ALJ observed that when Plaintiff began receiving regular mental health treatment, after a period of "paucity of treatment," she had "generally routine follow-ups and appeared to manage her stress relatively well." (AR 4147 (citing AR 1226, 1233-34, 1429).) The ALJ cites records from late 2014 to early 2015 to support her findings. The referenced records suggest that during this time Plaintiff was obtaining mental health treatment and effectively managing her largely-situational stress without medication. (*See* AR 1234 (12/10/14 visit with Christopher Adam Neumann, Ph.D where Plaintiff noted stressors related to procuring medications and changes to apartment management but reported managing stress "relatively well" and planning a trip to Mexico for the following week); AR 1233 (1/13/2015 visit with Dr. Neumann where Plaintiff indicated that she continued to experience stress related to her living conditions, but Dr. Neumann observed that she "appear[ed] to be managing her stress well"); AR 1429 (1/15/15 visit with Michael C. Chartrand, M.D. where Plaintiff acknowledged stress related to her living environment but reported that she was receiving psycho-supportive therapy with Dr. Neumann, in lieu of antidepressants, which was working and allowed her to function well); AR 1226 (9/28/2015 visit with Dr. Neumann where Plaintiff indicated that her generally positive attitude helped her manage stress).)

---

limitations following a review of the record. Nevertheless, Plaintiff's treatment for physical conditions during the relevant period appears to have produced additional, largely normal, mental status examinations to which the ALJ may well have been referring. (*See, e.g.*, AR 1002 (1/6/2012 examination where Plaintiff was "alert" and denied mental symptoms during a review of symptoms); 1061 (1/19/13 examination in which Plaintiff was reported to be oriented to person, place and time and to have a mood and affect that was normal and appropriate to the situation); 1063 (2/17/2012 examination reporting the same); 1097 (2/15/13 examination in which Plaintiff denied anxiety and depression and was reported to be alert and oriented to time, place, and person); 1101 (1/29/13 examination reporting the same); 1696 (2/1/2012 examination in which Plaintiff was reported to be "[n]egative for depression, anxiety, . . . ." ).) Even putting aside these unmentioned examination findings, the Court is satisfied that substantial evidence supports the ALJ's rejection of Dr. Baum's opined moderate to severe mental limitations.

Despite the ALJ's reliance on the evidence discussed above to support her findings, Plaintiff submits that her analysis of Dr. Baum's opinions was inadequate for three reasons. First, she contends that the ALJ failed to consider Dr. Baum's "psychological testing, numerous interviews/examinations with Plaintiff, and interview with a collateral witness . . . ." (Doc. 26 at 29.) In effect, Plaintiff suggests that the ALJ failed to fully consider the second *Watkins* factor: "the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed." *Watkins*, 350 F.3d at 1301. Plaintiff emphasizes the importance of this testing by asserting that the IQ test administered by Dr. Baum showed "atypical differentials between the verbal and performance IQ[,]" which according to Dr. Baum suggested "organicity," or presence at birth. (Doc. 26 at 29 (citing AR 4190-91).)

But to the extent Plaintiff contends that the ALJ neglected to consider Dr. Baum's testing or interviews, the Court disagrees. The ALJ explained that she gave Dr. Baum's emotional impairment diagnosis great weight because "Dr. Baum thoroughly explained the basis for his diagnosis, which entailed *testing he conducted* and accounts for the *personal histories provided by [Plaintiff] and her daughter*." (AR 4146 (emphasis added).) Plaintiff appears to maintain that the ALJ did not consider Dr. Baum's testing, because she did not identify the tests by name or include their precise numerical results in her decision. Under the circumstances, however, this degree of detail was not required.

In a related argument, Plaintiff suggests that the ALJ failed to adequately account for her inability to screen out irrelevant distractions and her emotional fragility, which, according to Plaintiff, were confirmed by Dr. Baum's testing. (Docs. 26 at 30; 33 at 3.) Dr. Baum's report indicated that "[t]he candidate scored 16/30" on the St. Louis Mental Status Examination, which "statistically link[ed] to moderately cognitive impairments." (AR 4467.) However, in his

administrative hearing testimony, Dr. Baum explained that the test results reported in his written report were not accurate. (AR 4186-87.) That is, he clarified that Plaintiff "had a score of 23 on the St. Louis" Mental Status Examination rather than the reported score of 16. (AR 4186.) According to Dr. Baum's testimony, the reported score of 16/30 was a product of miscounting, and Plaintiff's "actual score [of] 23" indicates "*mild* cognitive impairment" as opposed to moderate cognitive impairment. (AR 4187 (emphasis added).) With respect to the Plaintiff's MMPI-2 test results, Dr. Baum reported that at scores of "2/3" and "6," Plaintiff's responses were "statistically correlated" with individuals who demonstrate traits such as mild paranoia, sensitivity to rejection, fragility, becoming quickly overwhelmed, and learning to avoid stressful situations and people. (AR 4467.) The ALJ indicated that she considered Dr. Baum's testing, and she discussed the relevant findings and impressions produced by those tests, including that Plaintiff was emotionally fragile, sensitive to criticism, susceptible to becoming paranoid with stress, and sometimes "overwhelmed with a task at hand." (*Compare* AR 4467, *with* AR 4146.) Nothing more was required.

Plaintiff also touches upon the third *Watkins* factor – support from the relevant evidence as a whole – when she insists that Dr. Baum's findings and test results were supported by and consistent with Dr. Shams's 2006 psychological report. (*See* Doc. 26 at 30.) First, Plaintiff contends that "Dr. Baum elaborates" that his testing results "are reflected in Dr. Shams['s] 2006 mental status examination," as Dr. Shams "hinted [about organicity], but nobody followed up on it. He said that this was probably there before the onset date." (Doc. 26 at 30 (quoting AR 4191).) Plaintiff apparently posits that Dr. Shams's opinions support those of Dr. Baum on the issue of organicity. Notably, the ALJ addressed the issue of organicity in her decision, acknowledging that Dr. Baum "suggest[ed] that the nature and severity of Plaintiff's emotional impairment has been

longstanding and *lifelong*." (AR 4146-47 (emphasis added).) Reading the ALJ's analysis in context, the Court finds that the ALJ did not reject the notion that aspects of Plaintiff's emotional impairment may have originated at birth. Her finding was more nuanced. She rejected a finding that the *nature and severity* of Plaintiff's emotional impairment had been at the "marked or extreme listing-level" since birth. (*See* AR 4147 ("A finding of marked or extreme listing-level limitations is not consistent with the totality of evidence . . . . Dr. Baum's testimony suggests that the nature and severity of the emotional impairment has been longstanding and lifelong. This is not consistent with [Plaintiff's] education and employment history.") Indeed, the ALJ explained that "despite what Dr. Baum referred to as a lifelong problem, [Plaintiff] . . . had periods of stability where she could perform work functions." (AR 4147.) Significantly, even if Dr. Shams's opinions could be read to support Dr. Baum's opinion that Plaintiff's emotional impairment was present since birth, it fails to support a finding that Plaintiff had marked or extreme listing-level limitations since birth. The ALJ observed that "the examinations performed during the relevant period did not demonstrate any marked or extreme limitations." (AR 4147 (citing AR 2425-27 (Dr. Shams' 2006 report), 4109-22 (Psychiatric Review Technique completed by Dr. Carol Deatrick).) Moreover, the ALJ determined that Dr. Shams's 2006 report suggested that Plaintiff could perform unskilled work. (AR 4147 (citing AR 4102-04).)

The ALJ highlighted various findings and opinions by Dr. Shams. She noted that Dr. Shams gave Plaintiff a global assessment of functioning score of 51 and found evidence of a moderate to severe mood disorder. (AR 4146.) She also acknowledged that Dr. Shams found Plaintiff "emotionally and physically fragile" and recommended against placing her "in a work situation at the present time, particularly in a stressful work environment." (AR 4146; *see also* AR 4104.) The ALJ suggested, however, that the RFC she determined sufficed to account for limitations Dr.

Shams observed in Plaintiff's ability to cope in a stressful work environment. (AR 4146.) Ultimately, the ALJ gave Dr. Shams's opinions "little weight" for three reasons: (1) because Dr. Shams failed to "opine specific functional limitations," (2) because his statements concerning Plaintiff's ability to work involved an issue reserved to the Commissioner, and (3) because his mental status examination and observations suggested that Plaintiff was capable of simple, routine tasks. (AR 4146-47.) Acknowledging Dr. Shams's reports of impaired attention and concentration and inability to screen out irrelevant distractions, the ALJ emphasized that "other portions [of Plaintiff's mental status examinations] appeared unremarkable." (AR 4146.) For instance, she noted the following from Dr. Shams's mental status examination findings:

> [Plaintiff] presented with grossly intact memory throughout. She had somewhat impaired recent memory as she recalled 2 of 5 items after a 10-minute delay. As to judgment, this appeared to be "excellent" as she adequately assessed predictable consequences and modulated behavior in an appropriate fashion. Insight was "excellent" as she demonstrated a dept of self-understanding and self-awareness.

(AR 4146 (citing AR 4103).)

The Court's review of Dr. Shams's mental status examination findings confirms that, apart from impaired concentration and depressed and anxious mood, they *were* largely normal. (*See* AR 4102-03.) In addition to grossly intact memory, excellent judgment, modulated behavior, and excellent insight, which the ALJ noted, Dr. Shams also reported fluent, goal-directed speech; intact language skills, comprehension, and reading and writing skills; and an excellent "ability to provide an intact, substantial and rich description of important life events from memory." (AR 2426.)

While mental status examination findings are not necessarily dispositive of the supportability of a medical opinion, here, it was proper for the ALJ to consider such findings as part of her analysis of opinion evidence. Indeed, the ALJ was entitled to consider the degree to which Dr. Shams's mental status examination findings supported or failed to support Dr. Baum's

opinions. *See* 20 C.F.R. §§ 404.1527(c)(3); 416.920(c)(3). The Court can follow the ALJ's analysis and conclusion that Dr. Shams's period-relevant mental status examination evidence contradicted the opinions Dr. Baum offered outside the relevant period. (*See* AR 4147 (concluding that Dr. Baum's "marked or extreme listing-level limitations" were not consistent with Dr. Shams's report, which "suggest[ed] that [Plaintiff] was capable of simple, routine tasks").) Plaintiff does not demonstrate that the ALJ picked and chose among Dr. Shams's findings to record only those findings that supported her rejection of Dr. Baum's opinions. Nor does the Court find any error in the ALJ's failure to conclude that Dr. Baum's findings were supported by and consistent with Dr. Shams's 2006 report. To summarize, Plaintiff's arguments that the ALJ failed to adequately consider the second and third *Watkins* factors fail. The Court will not reverse on these grounds.

Plaintiff's remaining arguments relate to the fifth *Watkins* factor (i.e. "whether or not the physician is a specialist in the area upon which an opinion is rendered") and/or the sixth, catchall factor (i.e. "factors brought to the ALJ's attention which tend to support or contradict the opinion"). Plaintiff contends that the ALJ failed to adequately consider Dr. Baum's professional experience or the fact that he was "the ONLY medical source having the opportunity to both examine Plaintiff and her entire medical file." (Doc. 26 at 30.) Plaintiff emphasizes that Dr. Baum has decades of experience as a practicing psychologist as well as experience opining on remote onset dates for the SSA. (*Id*. at 31.) She suggests that Dr. Baum is the "only source with documented experience evaluating onset dates." (*Id*.)

The ALJ did not altogether disregard Dr. Baum's specialty and experience. Rather, she described Dr. Baum as a "psychologist . . . who identified an emotional and social impairment," a diagnosis to which she accorded "great weight". (AR 4143, 4146.) Although the ALJ could have spent more time addressing Dr. Baum's professional experience and the evidence upon which he

based his opinions, the regulations only required her to give good reasons for the weight she gave Dr. Baum's opinions. *See Oldham v Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (reasoning that an ALJ need not expressly apply each of the six relevant factors in deciding the weight to give a medical opinion). Once again, the ALJ's analysis indicates that she considered Dr. Baum's opinions and testimony, including as they related to the onset of Plaintiff's limitations. (*See* AR 4147 ("Dr. Baum's testimony suggests that the nature and severity of the emotional impairment has been longstanding and lifelong.").) Moreover, the testimony to which the ALJ referred included a detailed summary of Dr. Baum's credentials and experience, in response to which she determined that Dr. Baum was "qualified to testify as a[n expert] witness." (*See*, *e.g.*, AR 4179-83.) While it may be true that Dr. Baum was the only physician in the record to explicitly discuss Dr. Shams's 2006 report, (*see* Doc. 26 at 30 (citing AR 4182-83)), this does not change the fact that the ALJ reasonably found Dr. Baum's opinions inconsistent with Dr. Shams's mental status examination findings. (*See* AR 4147).

In sum, the ALJ ultimately disagreed with Dr. Baum's assessment that Plaintiff's mental impairments rendered her unable to perform any work, finding instead that her impairments were "well accounted for with restriction to simple, routine tasks with no fast-paced production work[,] . . . simple work decisions, occasional changes to work assigned while working in the same location every day, and no more than occasional [social] interaction[s] with no team or tandem tasks." (AR 4143). The ALJ provided substantial evidence to support her determination, and the Court is satisfied that she adequately considered Dr. Baum's findings and opinions in light of the applicable factors, including as those opinions related to organicity, inability to screen out irrelevant distractions, and emotional fragility. The ALJ gave legitimate explanations for rejecting Dr.

Baum's more extreme mental limitations, and the Court will not reweigh his opinions. Accordingly, the Court will not remand on this ground.

### B. The ALJ properly considered the opinions of Drs. James Gillies and Corey Barger.

Next, Plaintiff contends that the ALJ failed to adequately consider the opinions of her treating mental health providers, James Gillies, Ph.D. and Corey Barger, M.D. (Doc. 26 at 31-33.) Both treating providers completed "Medical Source Statement: Mental Limitations" forms in March 2020. (*See* AR 4092-4101.) Dr. Gillies noted clinical findings of "[c]ontinuous, excessive worry & anxiety[, e]motional dysregulation[, and p]oor distress tolerance." (AR 4092.) Similarly, Dr. Barger noted clinical findings of "increased anxiety & near paranoia[,] poor ability to institute a plan or tolerate change[,] . . . [and] difficulty maintaining complex interpersonal relation[]ships." (AR 4097.) Of the mental abilities and aptitudes needed to do unskilled work, both Drs. Gillies and Barger found Plaintiff had "[n]o useful ability to function"[7] in her abilities to "[m]ake simple work-related decisions" or to "[d]eal with normal work stress" and was "[u]nable to meet competitive standards" in her ability to "[r]espond appropriately to changes in a routine work setting." (AR 4094, 4099.) Of the remaining thirteen abilities, Dr. Gillies further found that Plaintiff was either "unable to meet competitive standards" or had "no useful ability to function" in all but two areas.[8] (*See* AR 4094.) Dr. Gillies indicated that his most restrictive opined

---

[7] The Medical Source Statement forms provide that having "[n]o useful ability to function" in an area is "an extreme limitation" and means the "patient cannot perform this activity in a regular work setting." (*See* AR 4094, 4099.)

[8] Specifically, Dr. Gillies found Plaintiff extremely limited in her abilities to "[w]ork in coordination with or proximity to others without being unduly distracted"; "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms"; "[p]erform at a consistent pace without an unreasonable number and length of rest periods"; "[a]ccept instructions and respond appropriately to criticism from supervisors"; and "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavior extremes." (AR 4094.) He also found Plaintiff unable to meet competitive standards in her abilities to "[r]emember work-like procedures"; "[m]aintain attention for two hour segment"; "[m]aintain regular attendance and be punctual within customary, usually strict tolerances"; "[s]ustain an ordinary routine without special supervision"; "[a]sk simple questions or request assistance"; and "[b]e aware of normal hazards and take appropriate precautions" (AR 4094.)

limitations were supported by medical/clinical findings that Plaintiff's "greatest hinderances involve stress management . . . ; concentration, attention & consistency in focus on task for extended periods; and poor interpersonal relationships, dependent traits and poor boundaries." (AR 4094.) Dr. Barger, in turn, explained that his most restrictive opined limitations were supported by medical/clinical findings that Plaintiff "has difficulty responding to stress and decissions [sic]" and would "often become irritable and/or withdraw." (AR 4099.) Both doctors opined that, on average, Plaintiff's mental impairments would cause her to be absent from work more than four days per month. (AR 4096, 4101.)

The ALJ summarized the opinions offered by Drs. Gillies and Barger, explaining that Dr. Gillies "largely indicated that [Plaintiff] was unable to meet competitive standards or unable to perform nearly all areas of mental functioning," and Dr. Barger included "several ratings indicating greater mental restriction than" those she found in determining Plaintiff's RFC. (AR 4147 (citing AR 4092-4101).) The ALJ also recited the "medical/clinical findings" supplied by the doctors to support their most limited categories of mental functioning. (*See* AR 4147 (citing AR 4092-4101).) Finally, the ALJ noted the doctors' opinions regarding the frequency of absences from work. (AR 4147 (citing AR 4092-4101).)

When the opinions at issue are those of treating physicians, as here, the ALJ must first consider whether they are "well supported by medically acceptable clinical and laboratory diagnostic techniques and . . . consistent with the other substantial evidence in the record." *Allman v. Colvin*, 813 F.3d 1326, 1331 (10th Cir. 2016) (quoting *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007)). "If so, the ALJ must give the opinion controlling weight." *Id*. (citation omitted). Even if a treating physician's medical opinion is not entitled to controlling weight, it is "still entitled to deference," and the ALJ must decide what weight, if any, to give it. *Oldham*, 509 F.3d

at 1258 (quotation omitted). In making that determination, the ALJ must consider the *Watkins* factors, discussed above. The "ALJ must give good reasons" – reasons that are sufficiently "clear to any subsequent reviewers" – for the weight that she ultimately assigns to those opinions. *Langley*, 373 F.3d at 1119.

Plaintiff contends that the ALJ "skip[ped] the first step of the analysis and fail[ed] to determine whether there [was] good support for Drs. Barger and Gilles' [sic] opinions and/or whether they [were] contradicted by other substantial evidence." (Doc. 26 at 32.) Moreover, Plaintiff submits that the ALJ "fails to cite contradictory medical evidence." (*Id*. at 33.) The Court disagrees on both accounts.

Although the steps of her treating physician analysis appear out of order, the requisite components are present. That is, with respect to the first step of the analysis, the ALJ found Drs. Gillies and Barger's opinions inconsistent with other substantial evidence in the record. (*See* AR 4147.) Having discussed the doctors' opined mental limitations and their clinical findings, which largely centered around Plaintiff's difficulty managing stress, the ALJ explained that records from Plaintiff's mental health treatment *during the relevant time* "indicated that she managed her stress well overall and that she functioned well." (AR 4147 (citing AR 1233-34, 1429, 1448-49).) In other words, the ALJ found that Drs. Gillies and Barger's opinions were, insofar as they related to Plaintiff's functioning during the relevant period, contradicted by substantial evidence to the contrary. (*See* AR 4147 (citing AR 1233-34, 1429, 1448-49).) Although Drs. Gillies and Barger purported to provide "medical/clinical findings" that supported their opined limitations, (*see* AR 4094, 4099), those findings were at odds with the period-relevant mental health records to which the ALJ referred. As discussed above, the medical records from the relevant time period suggest that Plaintiff's stress was largely situational and well-managed, even without the use of

medication. (*See* AR 4147 (citing AR 1234 (12/10/14 visit with Dr. Neumann where Plaintiff noted stressors related to procuring medications and changes to apartment management but reported managing stress "relatively well" and planning a trip to Mexico for the following week); AR 1233 (1/13/2015 visit with Dr. Neumann where Plaintiff indicated that she continued to experience stress related to her living conditions, but Dr. Neumann observed that she "appear[ed] to be managing her stress well. . . ."); AR 1429 (1/15/15 visit with Dr. Chartrand where Plaintiff acknowledged stress related to her living environment but reported that she was receiving psycho-supportive therapy with Dr. Neumann, in lieu of antidepressants, which was working and allowed her to function well); AR 1448-49 (2/2/2016 visit with Dr. Chartrand where Plaintiff's "mood remain[ed] good . . . and stress at home ha[d] improved," the review of symptoms included "alert and oriented x 4" and "[n]o anxiety, depression," and Plaintiff was cooperative and had an appropriate mood and affect during the examination)).)

Plaintiff, for her part, submits that the medical records cited by the ALJ are not "meaningfully contradictory." (Doc. 33 at 3.) First, she contends that Dr. Chartrand's January 15, 2015 record, in which he reported that Plaintiff continued to experience severe stress due to her living environment, does not contradict Drs. Gillies and Barger's opinions. (*Id*.) Closer inspection of the record, though, undermines Plaintiff's position. In providing her "history of present illness" to Dr. Chartrand, Plaintiff reported that she was "continuing to have a lot of stress related to her living environment" at her new apartment "related to animals defecating around her apartment and creating a lot of unsanitary issues." (AR 1429.) Plaintiff also reported, however, that her psycho-supportive therapy and counseling, which she was pursuing in lieu of medication, was "working" and that she was "able to function well." (AR 1429.) Plaintiff indicated that she had recently returned from "a vacation in Mexico" and was "feel[ing] happy and[,] other than the stress of her

living environment[,] . . . able to focus on positive things in her life." (AR 1429.) Overall, this record supports the ALJ's determination that Plaintiff was effectively managing her largely-situational stress without medication. It is also at odds with Drs. Gillies and Barger's opinions that Plaintiff had extreme and disabling work-related mental limitations caused by her poor stress management skills.

Second, Plaintiff argues that her January 13, 2015 record from a visit with Dr. Neumann does not "meaningfully support the inference of sustained improvement," because it was dated "only two days before the 01/15/2015 record," discussed above, in which she reported to Dr. Chartrand that she was experiencing stress related to her living environment. (Doc. 33 at 3.) Just as the January 15, 2015 record supports the ALJ's treating physician analysis here, so too does the January 13, 2015 record in which Dr. Neumann observed that Plaintiff "appear[ed] to be managing her stress well . . . ." This record, like the others referenced by the ALJ, was reasonably characterized as a report that Plaintiff was effectively managing her largely-situational stress without medication.

Third, Plaintiff submits that the February 2, 2016 record from Dr. Chartrand referenced by the ALJ "makes no mention of her mental health other than 'she is compliant with her therapy for depression and her mood remains good at present and stress at home is improved.'" (Doc. 33 at 4 (citing AR 1448).) Plaintiff suggests that it was improper for the ALJ to rely upon this record, as Dr. Chartrand was "not a specialist in mental health." (*Id*.) As an initial matter, the Court finds that Plaintiff's reports during the relevant period that her mood was "good" and her stress at home "improved" *are* relevant to the issues for which the ALJ relied upon them, even if they were reported in the context of a medical visit aimed at addressing her physical symptoms. Moreover, the Court observes that the February 2, 2016 record also included Dr. Chartrand's review of

symptoms indicating that Plaintiff was "alert & oriented X 4" with "[n]o anxiety, depression" and, further, that Plaintiff was "cooperative" and had an "appropriate mood and affect" during examination. (AR 1449.) This record, when considered in conjunction with the other records referenced by the ALJ, supports the ALJ's treating physician analysis. The Court rejects Plaintiff's argument that the medical records cited by the ALJ are not "meaningfully contradictory."

Plaintiff also cites various other records, including two records from outside the relevant period, purporting to show that Drs. Gillies and Barger's opinions were consistent with the overall evidence. (*See* Doc. 26 at 32-33 (citing AR 1219 (2/1/2016 record from Katherine Brighid Hull, Psy.D. reporting that Plaintiff was "extremely anxious" about an upcoming move to Socorro and had recurrent moderate depression); 1237-38 (4/22/2014 record from Dr. Neumann indicating that Plaintiff has not been close to anyone since 2000, was frustrated and perseverating on people taking advantage of her, and was not sleeping well due to noisy neighbors); 1221 (12/16/2015 record from Dr. Hull indicating that Plaintiff "had a difficult work history" in which she experienced bureaucracy and politics and was injured at one job but did not receive worker's compensation and, additionally, began experiencing health problems, including arthritis and diabetes, and ultimately moved to New Mexico in part for better healthcare); 1239-40 (11/21/2016 report from Daniel Shank, M.D. indicating that Plaintiff was "extremely upset and agitated while talking about her [landlord and] began to panic and shake, expressing severe anxiety"; also reporting mental status examination findings of circumstantial thinking, impaired attention and concentration, and psychomotor agitation); 2440-42 (2/24/2017 record from Chief Resident Phil Michael indicating mental status examination findings of decreased eye contact, leg patting, mood "a little anxious" but congruent, labile affect with tears, decreased range of affect, circumstantial thinking, and fair insight and judgment); 4102-04 (5/20/2006 psychological report from Dr. Shams describing

Plaintiff as emotionally and physical fragile and recommending against placing her in a work situation at that time)).)

Considered as a whole, the Court cannot say that the evidence cited by Plaintiff overwhelms the substantial evidence upon which the ALJ relied in her rejection of Drs. Gillies and Barger's more restrictive opinions, which were rendered outside the relevant period. The ALJ explained that she "accounted for a mental health history notable for depression and anxiety" by "restrict[ing Plaintiff] to simple, routine tasks with no fast-paced production work and only simple work decisions, occasional changes to work assigned while working the same location every day, and no more than occasional interaction with supervisors, coworkers, and the general public with no team or tandem tasks." (AR 4143.) The ALJ insisted that "the alleged inability to do any work due to . . . mental health [impairments was] not consistent with the overall evidence during the relevant period." (AR 4143.) The medical records upon which she relied constitute substantial evidence supporting her conclusion that the mental health treating doctors' opinions were not entitled to controlling weight. Having found no error with respect to the first step of the ALJ's treating physician analysis, the Court will not reweigh the evidence or reassess the opinions of Drs. Gillies and Barger. *See Lax*, 489 F.3d at 1084.

Because the ALJ determined that Drs. Gillies and Barger's opinions were contradicted by substantial evidence and therefore not entitled to controlling weight, she also conducted the second step of the treating physician analysis, applying the *Watkins* factors to determine the weight that should be afforded to the opinions. As to factors one, two, and five, the ALJ observed that Dr. Gillies became Plaintiff's mental health provider in March 2019, approximately two and a half years *after* the relevant period, and, further, that Dr. Barger had been Plaintiff's mental health provider for only eight months at the time he provided his 2020 opinion. (AR 4147.) Factor three

– the degree to which the physicians' opinions are supported by relevant evidence as a whole –
overlaps with the ALJ's step-one analysis, where she determined that Drs. Gillies and Barger's
opinions were inconsistent with records from Plaintiff's mental health treatment during the
relevant time. (*See* AR 4147 (citing AR 1233-34, 1429, 1448-49).) With respect to the sixth factor
("other factors"), the ALJ alluded to ambiguity regarding the "earliest date the [doctors']
limitations applied" and reasoned that their medical source statements "provide[d] no probative
value for the relevant period." (AR 4147.) In so finding, the ALJ highlighted Dr. Gillies's
handwritten notation that the earliest date of Plaintiff's mental limitations was "unknown,"[9] (AR
4147 (citing AR 4092-96)), and likewise suggested that there was no implication that Dr. Barger
affirmatively related his opined limitations back to June 30, 2010, despite a typewritten statement
to that effect. (AR 4147 (citing AR 4097-4101).) Having applied the relevant factors, the ALJ
determined that Drs. Gillies and Barger's opinions were entitled to "little weight." (AR 4147.)

The Court can follow the ALJ's treating physician analysis, albeit out of order, and is
satisfied that she adequately considered the first step of the analysis as well as the relevant *Watkins*
factors and that she provided legitimate reasons for giving little weight to the treating mental health
providers' opinions. The Court will not reverse as to the ALJ's consideration of the opinions of
Drs. Gillies and Barger.

### C.  The ALJ adequately considered Plaintiff's hearing testimony.

In her final argument, Plaintiff contends that "the ALJ does not satisfy her duty to consider
[her] testimony/allegations." (Doc. 33 at 4.) Notably, Plaintiff does not argue that the ALJ failed

---

[9] Dr. Gillies provided his responses on the medical source statement using handwritten notes and marks. (*See* AR
4092-96). For purposes of identifying the earliest date that Plaintiff's mental limitations applied, the form included a
typewritten response, "Since before 06/30/2010," next to which Dr. Gillies wrote "unknown." (AR 4096.) The Court
can surmise that the medical source form was provided to Dr. Gillies with this date already supplied, but Dr. Gillies
disregarded the date and indicated instead that the date Plaintiff's mental limitations began was "unknown." (*See* AR
4096).

to consider the relevant factors under 20 C.F.R. § 404.1529(c) or even that she somehow neglected to comply with the dictates of SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).[10] Indeed, she does not cite any regulations or rulings in support of her position. Rather, she simply posits that the ALJ failed to "meaningfully consider" certain aspects of her testimony. (Doc. 26 at 33.)

The Court's examination of the ALJ's decision reveals that the ALJ provided a detailed summary of many of the relevant portions of Plaintiff's testimony. As to Plaintiff's subjective complaints of mental impairment symptoms, the ALJ recounted Plaintiff's testimony from a May 8, 2020 administrative hearing. (AR 4141 (citing AR 4288-4333).) The ALJ noted that Plaintiff testified she was constantly agitated and anxious, had difficulty getting along with others, and experienced anxiety when she was not in control. (AR 4141 (citing AR 4288-4333).) The ALJ recounted Plaintiff's testimony "that she had problems with focus and that she would become frustrated [and] yell[] at others." (AR 4141 (citing AR 4288-4333).) She also acknowledged Plaintiff's reports of lying down or locking herself in the bathroom during panic attacks. (AR 4141 (citing AR 4288-4333).)

Under 20 C.F.R. § 404.1529(a), the ALJ was charged with considering Plaintiff's testimony regarding her subjective symptoms "and the extent to which [those symptoms and complaints could] reasonably be accepted as consistent with the objective medical evidence and other evidence." § 404.1529(a). Having done so, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the period at issue." (AR 4141.) The ALJ explained that the medical records, including those documenting Plaintiff's mental

---

[10] SSR 16-3p was republished on October 25, 2017, with a revision to clarify that it applied to determinations and decisions issued on or after March 28, 2016. *See* SSR 16-3p, at *1. The ALJ's decision in this case was issued on January 27, 2022. (AR 4134-50.)

health examinations, revealed "signs of greater functioning than alleged." (AR 4141.) Plaintiff

contends that, in making this determination, the ALJ did not give adequate consideration to aspects

of her testimony. Specifically, she insists that "[t]he ALJ fail[ed] to meaningfully consider [her]

testimony pertaining to [her] past work, education, access to mental healthcare, and life

circumstances when weighing her symptom testimony and physician opinions." (Doc. 26 at 35.)

Notably, the ALJ *did* discuss these enumerated topics. First, she recounted Plaintiff's

testimony that she "complete[d] her education, including obtaining a Master's degree, and

perform[ed] in a skilled position as a teacher for a number of years." (AR 4147.) But she also

highlighted Plaintiff's testimony that "she could no longer work as a teacher due to her medical

condition." (AR 4147). Summarizing Plaintiff's testimony regarding her past work, the ALJ

explained:

> [Plaintiff] testified that[] when she worked as an elementary school teacher, she
> was not able to fit in and she thus moved around to change schools. She further
> indicated that she had difficulty understanding how to put things together the way
> others at school did. She testified that teaching was difficult and stressful. She noted
> trying to find other work, but that she had continued problems completing tasks and
> figuring out what to say.

(AR 4140.) The ALJ made the critical observation that "[w]hile there may have been difficulties

in the workplace as [Plaintiff] alleged, such difficulties occurred when working at a job requiring

skilled tasks and significant interpersonal interactions." (AR 4144.) Notably, the ALJ accepted

that Plaintiff had some work-related mental limitations during the relevant period and went on to

assess a mental RFC that precluded all of Plaintiff's past relevant work, including her work as a

teacher. (AR 4148.) The Court can discern no error or inadequacy in the ALJ's consideration of

Plaintiff's testimony about her prior work.[11]

---

[11] In the context of her argument about the ALJ's consideration of her testimony about past work, Plaintiff makes an
ancillary argument related to the exacerbation of her mental impairments by her physical impairments. (*See* Doc. 26

Plaintiff also contends that "[f]or all intents and purposes, the ALJ never meaningfully consider[ed her] testimony about her insurance status and life circumstances that prevented her from receiving mental health treatment or that she moved all the way across the country just to access healthcare." (Doc. 33 at 5.) The ALJ did, however, discuss Plaintiff's testimony "that after she stopped working[,] she no longer had health coverage and had difficulty obtaining new insurance." (AR 4141.) The ALJ observed that, as a result, Plaintiff had "sparse treatment and infrequent mental health complaints" during the relevant period. (AR 4144.) Acknowledging "that financial constraints impacted [Plaintiff's] ability to obtain medical care," the ALJ nevertheless determined that the limited medical treatment records that were available from the relevant time period failed to support a finding of disability. (AR 4141.) But the ALJ did not rely solely upon the limited number of mental health records in arriving at Plaintiff's mental RFC. Instead, she determined that the *substance* of the available mental health records suggested that Plaintiff was capable of unskilled work with additional social and adaptation limitations. The ALJ made this much clearer in her discussion of Plaintiff's mental health records from 2014 and 2015:

> [A]fter initiating mental health treatment in 2014, the majority of complaints appeared to be related to situational stressors and management of such. This culminated in routine follow-ups through the remainder of 2014 and through 2015. During such time [Plaintiff] received a high global assessment of functioning score of 70, which is indicative of only mild symptoms. In the interim, the claimant appeared to manage her stress relatively well. At one point, in September 2015, [Plaintiff] had complaints of sleeping difficulties and that stress may have played a role. As a whole, however, with mental health counseling, her reports generally indicate that she managed stress and depression and that she functioned well. Notably, the claimant had recently taken a vacation in Mexico and despite her noted stress related to her living environment, she felt happy.

---

at 34.) Arguing that this exacerbation is confirmed by Dr. Shams's 2006 psychological report, Plaintiff essentially rehashes previous arguments about the ALJ's purportedly erroneous consideration of Dr. Shams's opinions. Such arguments are not persuasive in this context, just as they were not persuasive in the context of Plaintiff's challenges to the ALJ's consideration of Dr. Baum's opinions. *See supra* Part IV(A).

(AR 4144 (internal citations omitted).) In short, the ALJ adequately set forth the specific evidence upon which she relied in assessing Plaintiff's mental RFC, *see Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000), and her analysis makes clear that she did not disregard the difficulty Plaintiff experienced in obtaining medical care.

While Plaintiff no doubt hoped that her testimony regarding difficult prior work experiences and the lack of health insurance would have led the ALJ to a different disability determination, the record demonstrates that the ALJ adequately and meaningfully considered these portions of Plaintiff's testimony. The Court is satisfied that the ALJ did not error in her consideration of Plaintiff's testimony or subjective complaints, and her findings are supported by substantial evidence.

## V.  CONCLUSION

Having conducted a thorough review of the administrative record, the Court concludes that the ALJ did not err in her review of Plaintiff's application for disability insurance benefits and supplemental security income. Accordingly, Plaintiff's Opposed Motion to Reverse or Remand (Doc. 26) is **DENIED**.

**KIRTAN KHALSA**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**